Good morning, Your Honors, and may it please the Court, Eric Anderson appearing on behalf of the petitioner Mario Abendano-Garcia. In this case, it is undisputed that Mr. Abendano-Garcia was given the oath of citizenship. The INS asked him to renounce his foreign allegiances, and he did that. The INS asked him to pledge his allegiance to the United States, and he did that. As a result, the INS actions present two primary questions I'd like to touch on today. The first is really, when the INS gives someone the oath of citizenship, does it have any meaning at all? According to the government, they maintain it doesn't. Our position is clear that it does. The second is the question of whether or not the INS must accept the consequences of its actions as they relate to the oath, just as my client had to accept the consequences of his pleas before. In addition, I'd like to briefly touch on a third question, and that is, is a guilty plea made without knowledge of the passage of a RERA subject to attack on due process grounds? In our briefing, our primary focus is on the question of citizenship, and the question of whether or not the INS, by having my client, the petitioner, sign the oath of citizenship, whether or not that made him a citizen, a national, or at the very least, to stop the INS from contesting his national status and removal proceedings. It's a pretty tough argument, I think, given the failure to observe the other requirements of the statute. So then you're left with a stopple. What's your best evidence of affirmative misconduct? In this case, it's the very act of giving the oath of citizenship. According to the government itself, it recognizes that it isn't supposed to do that. And the very act of taking the oath, of renouncing your citizenship, it's an operative act. It's the same as accepting a contract. If you say, I'm going to do it, this is the way it is. And I think that Richards v. Secretary of State drives that home. The fact is that the government asked Mr. Avendano-Garcia to give the oath. And the record's unclear as to exactly what happened at that meeting, at that interview. The briefs and the IJA both assumed that everything against my client, Mr. Avendano-Garcia, they assumed that he didn't have any reasonable reliance on the government. At some point, the IJA was actually looking to go and explore that issue, and then decide not to do so. We maintain that's error, that the very mere fact of taking that oath is enough to say it's affirmative misconduct. It goes far beyond negligence. And the real question is... How would you raise the distinction between affirmative misconduct and simply misconduct? Because basically what you're saying sounds to me like it's a straight estoppel argument. Absent the additional requirement that we impose on people seeking estoppel against the government, there's affirmative misconduct. Usually when we're having affirmative misconduct, you show some intent or some perhaps bad motive, rather than just saying, okay, take the oath. Well, in this case... You just have justified reliance, it seems to me. But go ahead. Well, in this case, particularly in terms of Socop and Gonzalez, what we're looking at in terms of the affirmative misconduct, of putting that intent element into it, it's two parts. First is, to the extent that something was said to Mr. Avendano-Garcia at the time that he took the oath of citizenship, it's untrue. There had to be some level of untruth there. Either that the oath didn't mean anything at all, because our position is that it did, or, and even if it didn't convey nationality or citizenship, which we strongly maintain that it does, the fact is that by renouncing his allegiances... Repeat that last sentence I misquoted. Well, to the extent that the government told him that it was meaningless, that it was just a step on the way to full naturalization, which, frankly, we don't know whether that happened or not, because the record isn't developed, that we maintain that that, in fact, was untrue, and the question of intent is something that needs to be explored. But the fact is that our position is that by taking the oath, by giving him the oath, he did, in fact, do something operative, that he not only swore his nationality and permanent allegiance to the United States, but also that he did, effectively, renounce his allegiance, and that there's no way that he could have taken that oath without acknowledging, with the idea of believing that there wasn't going to be a consequence to it, which is untrue, or that there was, and the fact is that the government's position is now, no, there really was no consequence at all. So now the question of whether or not... That's your position. I mean, you have to... It seems to me that they can rely on the fact that an asylum officer can't waive the statutory requirements. Well... I mean, has... How... Why do you think that an asylum officer would be empowered to waive the requirements of the statute? I don't think we can do that as judges. Well, to the extent that there's any... The requirements of the statute have primarily been met, or the fundamental requirements have been met. He passed the English test. He passed the civics test. He went and he took the oath of citizenship. And I think that the case of Gorbach v. Reno really sort of drives home the fact that, here, we're not talking about, necessarily, a violation of the statute, or our understanding of the statute, because under 8 U.S.C. 1448, the Attorney General is empowered to administratively provide the oath of citizenship. And in Gorbach, what was at issue there was the fact that the INS has done such a horrible job about... Well, Gorbach was different. Gorbach, they were trying to renounce or revoke a citizenship that was granted. Well, but it was erroneously granted. And I think that that's what brings this case... I'm not afraid of Mr. Gorbach. Well, in the opinion itself, there was significant notice taken of the fact that the INS has had a track record in the past of granting citizenship to people who may not have necessarily met the requirements. People who couldn't speak English, Mr. Avendano could. People who hadn't necessarily passed the civics test, he had. People who shouldn't even have been eligible to apply. Yet, they all received citizenship, and then when the INS tried to turn around and say, well, even though we may have given it to you in error, now we want to just take it away, Gorbach says you can't do that. Right, but Gorbach doesn't say that. I mean, Gorbach presumed that the citizenship had been properly granted, and that the United States didn't contest that. They said all the nice views were observed. However, we think it was defective. We think we have the power to reopen. And we said, well, that's final. No, you can't reopen it absent certain circumstances. Well, and in this case... And of course, they had the option of bringing an action in court to revoke under the statute. Well, and we believe that's the case here as well. And when we focus on the niceties, our position is clear that the taking of the oath itself is the act that conveys citizenship. And the fact is that the way that the statutory scheme is set up in 1448, also within the department's own regulations, there's room for the INS to sit there and say that we're not going to necessarily have a public ceremony, that that particular requirement isn't there to the extent that we're talking. And that's the only real statutory requirement is 1448C. Well, you know, you've made a good try, but we've got Padano. And I don't know that you're paying enough attention to footnote four, which says the applicant may withdraw the application before the full oath of allegiance is taken as part of a naturalization ceremony. I mean, we have to deal not only with the statute, but with, I'd say, a strong precedent. We can't just brush it off. No, and I think in our briefing we tried to directly address Padano, because to the extent that the government is arguing... Is that footnote? I believe that we addressed the argument surrounding... So the oath of allegiance is part of a naturalization ceremony. Well, it does. And to the extent that we're talking about the ceremony, if that's the real focus of the analysis... Well, it's a public occasion. I mean, it's not just in somebody's office signing something. Well, the statute also empowers the INS to do it not just in a public ceremony, but in an administrative ceremony. But with permission. I mean, this is a very important, critical thing to become a citizen, and all kinds of safeguards set up that it be a public matter. Well, absolutely. And the government, Congress, shifted authority from that from the courts to the Attorney General. And the INS is the Attorney General. One of the arguments that was never raised down below was an argument that the INS official who actually gave him the oath wasn't empowered to do that. If there's a question about whether that's the case or not, we firmly believe that we're entitled to a remand on those issues, that there are issues of material fact about what happened on that day. But in terms of what the statutory scheme sets up, what we believe GORBACH stands for, and also the regulations themselves, that it's actually the giving of the oath that is at operative effect. And in terms of Perdomo Padilla, and even Reyes, Alcaz, that there's a step beyond just taking the Oath of Allegiance that's here that was missing in all those other cases. That what you have is not just the Oath of Allegiance, which you have in the military situations, but you also have that renunciation of foreign allegiances. And that that difference, that operative act that took place, is enough to not only convey citizenship, but also to establish Mr. Avendano's Garcia's permanent allegiance. Something that no one really questions as a subjective or objective matter. It's really just a question of whether Perdomo Padilla somehow operates to block what actually happened here. Here's a man who built his entire life in this country. He owns a home. He's made mistakes. It's true. But at the same time, every indicia of allegiance says that this is his home. This is his place. This is where his family is. And the fact is that at the time that he pled, he wasn't given enough opportunity to even know that Herrera was there. So I see I'm running short on time here. But again, it really is a question. It really is about giving the oath. The fact is that that established his nationality. It established his citizenship. And to the fact that the government has a pattern of giving the oath to people who might not have done it, who might not have necessarily gone that last step of having everything approved, we say that that's a pattern of false promises that was being made. That only those people who have gone far enough in the process to get there that have met those qualifications stand qualified for it. So that this is not really a situation of throwing open the floodgates, but really recognizing that for this limited group of people in this subset, particularly Mr. Avendano Garcia, that he's entitled to have these actions that the INS provided for him have the operative effect that they deserve under the law. How old was he when he came to this country? I'm not sure of his exact age, but I believe it was fairly young. Where is he now? He's now in Guatemala. And was there some problem with his removal? Yes. I see I'm out of time. In terms of his removal itself, he was actually removed prior to the time for appeal to go through, which is one of the reasons why he didn't receive notice of the final order until after it was sent to him several months later. The panel of this court has ordered the INS to allow him back in, but while he was here, because he was unable to make bail, he'd been in detention for a long period of time. And as we mentioned in our brief, during his removal process, it was continued several times because the attorney who was supposed to be representing him the first time that he tried to fight removal wasn't even an attorney. He was fraudulent. And when they found out, the BIA determined that that wasn't enough to reopen the case, but the government in a habeas proceeding agreed to reopen the case. However, when the IJA reopened, basically relying on Prodomo-Perdia, the next round of proceedings was very summary in nature. He was required to come out with some additional information. What was that? Well, in the first round of proceedings, he was asked two things. One was whether or not he had registered for the selective service. He said he had, but at the time, his attorney, who wasn't even an attorney, hadn't brought that information with him to court. But he had an attorney or something? No, it was someone who represented himself to be an attorney, but he was using a bar number, but he wasn't. He's currently doing jail time, I believe. He's doing jail time in Guatemala? No, down in the Central District of California. But so the IJA took it upon himself to call up the selective service and try and confirm whether or not he had actually registered, came back, said he hadn't. But, in fact, as the record in the case shows, Mr. Robin Delgarcy had done that. Had registered? Had registered with the selective service. And in addition to that. Information he hadn't registered? Yes. I'll take your word for it. Where is that in the record? It's in the administrative record at 343 and 275. But in addition to that, at the very first hearing, the IJA had actually raised, as I mentioned earlier, serious questions about the manner in which the oath was given in the first place. He wanted to have the person who gave the oath appear, testify, explain what was going on, and then somewhere between that first hearing and the second hearing, the IJA simply shifted gears and decided that on the basis of the fact that his application was eventually denied, which we maintain is not really relevant to the analysis here, that he was removable and that he wasn't a national. It was denied? When did he get the information telling him that he needed to produce some more information? Oh, he received that in September of 1996, right around the time, a little bit after he committed the crime that he eventually pled no contest to, that served as the basis for his deportation. And so where was he at that time, here? He was here. The record's silent as to whether or not he was free at that point or not. He eventually pled guilty about a month and a half later, or pled no contest about a month and a half later. So in a sense, he had the interview, he left, committed the crime that served as the basis for his deportation, then was notified that his application had been denied because he hadn't shown up for the second interview, which we're unsure of. The record doesn't say what that was going to be about. And then he pled guilty, no contest, I apologize. And then three and a half years later, the INS initiated the removal proceedings against him. Okay, thanks. Thank you for your time. Good morning. May it please the Court. My name is Cindy Farrier, and I'll be representing the Attorney General in this matter. First off, I would like to make clear that the government does dispute that the oath of naturalization was ever taken by this particular petitioner. And we also want to make clear that this petitioner was denied naturalization. His application, he went for an interview, he was requested to provide more information. He did not provide it by the time set. The DHS denied the naturalization application. Petitioner had 30 days to appeal that. He did not do so. Is that when he had the criminal as the lawyer? No. Well, let's see. Yeah, sure. By that time, well, he had personal notice of the – It's not clear from the record that he had representation by that point. Petitioner's immigration proceedings were not instituted until 2002. This was in 1996 that his naturalization application was denied. Okay, but I'm looking at this naturalization oath here. And it's – you know, and there's the oath. The same oath that's administered when someone takes the oath of citizenship, right? Are you referring to on the processing sheet, the INS processing sheet at the top? Yeah, right here. It's a number in the lower right-hand corner, 000116. And it says, I hereby declare on oath. And it goes through the whole thing. And it's signed by – this appears to be his signature. Right. I don't dispute that he signed an oath of – the oath that we give to persons who appear before the public in a naturalization ceremony. I've administered this oath many times. It's the same oath, word for word. Right. And I have administered this oath on the telephone to – I remember there was a gentleman who had served with our army in the Philippines. And he was dying in a VA hospital. And it was – the only way I could administer the oath was on the telephone. And I did it on the telephone. And I've also administered the oath once to a person who was in the Encino Hospital and did that. Of course, the INS asked me to do it. And I administered the oath to that person. And he died the next day. He just wanted to die a citizen. So you don't need a real formal ceremony or anything like that. But he did. I mean, this is the same oath, word for word. And it's on a government form. Pursuant to statute, you do need a ceremony or you need special permission, as you mentioned, to not have a public ceremony. According to – How's – you know, how's he supposed to know that? He's before a representative of the Attorney General who has jurisdiction over the Immigration and Naturalization Service. And here's an oath that he took. Same oath. Well, to the extent that you're suggesting that by estoppel, he should be the – I'm not suggesting anything. I'm just telling you he took the oath. He took the oath, but he did not complete the full naturalization process. Why would they give him the oath? Why would he sign the oath? Because there is a requirement under the regulation that an alien indicate his willingness to take the oath of naturalization. I believe at that time the process for DHS was to have the alien read the oath during the interview, to sign to it to indicate that they would be willing to do that in a formal ceremony. That particular sheet that you're looking at does not indicate that he was actually advised that that was not the oath of naturalization. However, his application was later denied, and he did not appeal that. It was quite clear that he was never granted citizenship as a naturalized citizen. So under Perdomo, which requires – Is this a routine thing where you have this oath of citizenship and the applicant signs it? I do not know. Well, you should know that, shouldn't you? I know that it was on that form. I do know that they have to – I've never seen this before. Well, as Petitioner points out in their reply brief, the naturalization application now, the actual application contains the oath where an alien signs with the indication that this will be given to you, and you need to be aware that you're going to have to, at some point, subscribe to this in order to become a naturalized citizen. Yeah, but this form doesn't say that, does it? No, but his application was denied. So if you're – so what I'm saying is that he was not granted naturalization. Why was his application denied? Because he didn't provide further information as was requested at that particular interview. And what was that? The record evidence does not indicate what that evidence was. But we don't even know what he was asked to provide. That particular denial is not actually before the court. The actual denial is not before the court's review because he never appealed that. He did not exhaust his administrative remedies for that particular issue. We don't know what he was – what additional information he was asked to. I mean, you've got these comments here. You know, he had an assault with a deadly weapon. He had a drunk driving and domestic violence and then selective service. And then he had another DUI back in 1996. That's all laid out over there, comments. Yes. And then he's given this form and he signs the oath. That – but he was not granted citizenship at that time. A formal naturalization – certificate of naturalization as required by the – Now it says that on the form. On the application then in Alien Science. This one, but not this one. Not that particular time, but he was nonetheless notified at that time that he still needed to present additional documents in order to be granted naturalization. Is that in the record? That particular form there shows that he was referred over. What in the record tells what happened? The denial of the naturalization application, which was served upon him personally. Oh, no. At the time he signed this, what's in the record? At the – it's just only that. It's just that particular form. And then in the record we have, there is the actual denial. Oh, yes. Yeah. It is that. But you said he was told at that time. I can't say that he was necessarily told that that particular oath would not be the oath of naturalization. However, I can verify that he was told he needed to provide additional documentation in order for his naturalization application to be granted. How do you know that? Because that particular form says that he was referred for an interview. Nonetheless, even if the court were to determine that he was improperly – or that the record is deficient as to what he was told at that time, the Supreme Court has said that neither by the doctrine of estoppel nor by the invocation of equitable powers can any court confer citizenship. Essentially, you cannot go outside of what the statute requires in order to equitably grant someone citizenship. This petitioner was denied citizenship. He did not appeal that particular denial, but now instead claims that he is a national. He had a criminal lawyer, right? Not at that particular time. He was on his own or he was served. Where was his lawyer? There's no record that he necessarily had a lawyer then. You know, I hope it's changed now, that a disbarred lawyer can represent an applicant before an immigration judge and before the BIA. I believe that that has changed now under the regulations. But that was the rule at that time, right? Those particular proceedings were – We've got an audience out here wanting to know what's going on in this country. This is our country. They have a right to know what goes on. Just to be clear, this particular alien went back before an immigration judge with a new attorney, with an attorney that there has been no complaint about ineffective assistance. Who was that attorney? I don't have the particular name with me right here. We have a list of attorneys that we have our own central intelligence agency. Well, there's been no suggestion that this particular attorney provided ineffective assistance on the reopened, remanded proceedings. And, in fact, the immigration judge reheard the entire case but applied Perdomo, which had come down in the meantime, to find that this alien was not a national of the United States. And also to consider and to determine that, in fact, the aggravated felony existed. Can I explore one question with you? Sure. On the naturalization, you've got, I think, a pretty good case. But I don't quite understand why the Immigration Service chose to proceed in this case because his main offense was an offense against his wife, wasn't it? There were several offenses, but that is the removable offense. And so now the way we vindicate the rights of his wife is to kick him out of the country. So she's now deprived of her husband, whom she's apparently still with. Isn't that the effect of what you're doing? The DHS is applying the law as it stands. I know you're applying the law. I'm talking about using common sense. You know, hundreds of thousands of people get into this country illegally, and you pick a particular person. Why do you do it? It seems perfectly perverse to carry out this policy in punishing spousal abuse by removing the spouse in a way that, I mean, don't you think about that sort of thing when you're defending the government's position? Don't you think about it? I believe that the Immigration Service did the right thing here. They applied the law. Why do you think it's the right thing to remove the husband for spousal abuse and thereby deprive the wife of her husband? Well, it's the immigration judges and the board's decision that you're reviewing. And the children of their fathers. Congress has defined this particular conviction as an aggravated felony. Congress has made that decision. Department of Homeland Security is applying the law in order to institute removal proceedings, as it does for all persons that have particular convictions like this which make them removable. Well, what do you think the average congressman would say if I called one up and said, hey, they gave this fellow the oath of allegiance, and, you know, it's all there. He signed it. He was not given it. And what do you think about that? Oh, now they put a little disclaimer on it, but at that time they didn't. There is no reason to believe that. Well, he was not given the oath. You know what they say, I don't believe it. I'll send you this. The oath of citizenship was not given to him in a public ceremony as normally given and certainly as required by the statute. Publishers' clearing house sort of thing. You may be a winner, but you have to. You have to. Certainly at the time, if he believed that he was in fact a citizen, he could have appealed that denial of naturalization and did not do so. Your position is that this form 468 may have been deficient because it didn't disclose that they were just indicating the willingness to do that. But we don't know from the record one way or the other, but that's what you presume. Right. I assume, I don't know if there's any doubt that this is the predecessor to the normal form. It says processing sheet, right? Yeah. I'm not certain that it is used nationwide or if it's just a regional form that they use. Let me ask you this. If you think about it a little bit, about the common sense of it, what you're doing, would you be willing to enter into mediation? There's no need for this case to enter into mediation. Well, you don't see the irony or paradox about punishing spousal abuse by kicking the spouse out of the country. Again, Your Honor, with all respect, Congress has defined that as an offense which constitutes a ground of removal. So from our perspective- Well, obviously in some cases that would be reasonable if the wife didn't want to see him again. There is no- I mean, that's one reason we have mediation, to take account of unusual circumstances. There is no- Don't you want to find out what the wife thinks? This particular petitioner was found removable. He doesn't contest the fact that he is in fact removable on that particular basis. He contests the application of the definition to him. I know, but I'm not asking you to recite the law, but just to think about it as a reasonable human being. As a reasonable human being, I do not believe that mediation is appropriate in this particular case. And you think it's okay to break up the family? I believe in this case petitioner made his decisions, and under the law as it stands- What was the decision he made to break up the family? He did something wrong. People do do that. He had several convictions for that, but the one ground that was actually the ground of removal was later. But nonetheless, it is a ground of removability. He was properly found removable on that basis. And there is no question with regard to that actual conviction constituting a crime of violence, if that definition is applied to him. And there's no question that this case actually where the definition is being applied to him retroactively, because the actual definition was in place prior to his actually pleading guilty. So it's clear that- Who represented him when he pled guilty? He had a public defender, I believe, at the time. That was a criminal attorney. It was not his attorney from his immigration proceedings as far as I know. So the government's position here is that petitioner was never given the oath of citizenship as required by statute, which would make him a citizen. He did not appeal the denial of his naturalization application. It is clear that he is not a citizen of the United States. Under Perdomo, the only way that he can become a national is either through birth or through the full naturalization process. That didn't occur here. Did we have a hearing to find out what happened? No, because the Supreme Court has said that any court cannot grant citizenship through equitable or means of estoppel. There is no question here that he was- Say that again. That he cannot be granted- here, I'll read the- that neither by the doctrine of estoppel nor by the invocation of equitable powers may a court confer citizenship. And that's in the Supreme Court's decision in Pangolinian at 486 U.S. 485, specifically at 885. What was the date of that? That was in 1988. So- What were the facts there? That was with regard to, I believe it was aliens who were from the Philippines or in Manila and who wished to apply for citizenship under an expired statute due to their- I believe it was due to their service in the military. But the Supreme Court said- That was a situation where these Filipino scouts and soldiers who served with or were in alliance with American forces were promised citizenship. And they had to go to the U.S. Consul General in Manila. And Emmanuel Quizon, he didn't like that idea. So what the State Department did was they withdrew the Consul General from Manila. So they had no place to apply to. Isn't that the case? I believe that's the case, yes. Yeah, I mean, yeah. But in response to that, the Supreme Court said that through estoppel or equitable powers, the courts still have no power to confer citizenship in disregard of this statute. But there was no one there that took an oath. There was no place they could go because they took the Consul General out of the country. But it's also clear that this particular alien didn't take the oath in the way that it is described by the statute. He did say, I hereby declare an oath. It is an oath. Any person could be walking down the street and take that particular oath. That doesn't necessarily mean that he would be a citizen of the United States. No, but it's unofficial form and the proceedings that was held were in the Federal Building downtown. I assume. But nonetheless, he was denied. That particular application was denied, and he did not appeal that denial. If there are no further questions. Well, what grade would you give the government in this case? I think. I think. An A plus. A plus. I want to go to your college. All right. I want to say something. Yeah, sure. I just want to leave with two quick points. The first is that giving him the oath was not in violation of the statute. It was consistent with it because the statute itself has crafted exceptions to the public ceremony requirement. Right, but I mean, this is really part of a processing. I mean, that's if you fill out the paperwork, you go through the regulations, you get this naturalization approved or not, and then you have the ceremony. Isn't that the normal way? That's the normal way. You're not really seriously disputing that this was a predecessor form to whatever form they have now. Well, to the extent that he was at the verge of getting his citizenship approved. He had gone through all the steps that the statute required, and they gave him the oath. The only step in between that seems to be missing is an actual formal approval from the Attorney General. That would be an important step. Well, our position is that giving him the oath is that step, that the Attorney General delegated that power to that particular official who decided to approve that application right then and there. By the very least, we should have some facts on that. Although the other is just the other. I mean, suppose we send it back. What would the facts be then? Given the fact that we're unable to supplement the record at this point and the fact is we don't know what the official was thinking at that point. No, but what would we send it back? What would we ask the body to do? Well, we'd ask the district court to examine the circumstances surrounding his claim of nationality, including what happened on the day that he was given the oath. We'd love to have the official who did it come in and explain exactly what's going on. So what if he says, I just gave him the form and he filled it out? What does that do to your case? Well, to the extent that we believe that he's met the statutory requirements, we believe we're entitled to that as a matter of law. But should you go the other way on that, then I think that it would obviously pose some issues for us. On the other hand, if he comes in and says, I told him everything was okay, that the second interview was just going to be a formality, that he had basically been approved on this, we feel that our case is that much stronger. And the other thing that they might get some facts for an estoppel. Do you think you can identify the official? We believe that we can. Of course, the government might see that they were going to lose this case and might want to mediate it. But if the government is so sure it's going to win it, they can't believe it. And the second point I want to leave with is just, in terms of our due process argument, there's a question about notice. Mr. Abendano-Garcia, he pled guilty to 19 days in jail and a suspended sentence. Yes, it was after Arrera. Yes, the Ninth Circuit has recently moved away from the position suggested by the retroactive application. But the fact is that under cases like Texaco v. Smart, taking away somebody's property that they haven't used for 20 years required a two-year grace period. Mr. Abendano-Garcia has challenged collaterally his conviction on the basis of the fact that his attorney didn't tell him. Under Strickland v. Washington, presumably there's a wide range of attorneys who wouldn't have known within the first 39 days of Arrera's passage on September 13, 1996, that this one little section of a 200-page bill was going to apply immediately and retroactively. We think fair notice requires something more than that, at least enough time to allow the written publication to get out to attorneys out there. Not everybody has access to Lexis. Not everybody has access to Westlaw, particularly somebody in Mr. Abendano-Garcia's situation. And to turn around and tell him that he's pleading no contest and accepting very little jail time is enough to justify his deportation when he was in the dark, I think violates due process as well. Probably the public defender's office didn't know anything about it either. I mean, they just probably figured, well, okay, that's a good disposition and see you later. Exactly. Congress said, you know, Arrera is a sea change in the law, particularly in moving from five years to one. And Mr. Abendano-Garcia was simply caught up in something he didn't know about. I think that's unfair on many levels, and it rises to the level of a constitutional due process violation. At the last hearing, at least that I have in my records here, your client indicated that he was separated from his wife and his wife didn't want to see him because of the domestic violence. Do you have anything to supplement that? I could provide that. At this point, we don't have anything with us, largely based on the statutory requirements about what the record could be. Right. I mean, what I was asking, I suppose, I've asked in our place, there's nothing in the record to indicate otherwise at this stage, right? At this stage. Okay. I can't say that we wouldn't be able to supplement it and show that he, in fact, his presence here would be welcome. What is your law firm again? Payne & Pierce. Payne & Pierce. And you're taking this pro bono. Yes, Your Honor. And we appreciate that very much. Thank you very much for your time. If there's no more questions. Thank you. Thank you.
judges: Pregerson, Noonan, Thomas